1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| G & G CLOSED CIRCUIT EVENTS, LLC, | Case No. 1:20-cv-01400-JLT-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | (ECF No. 14) |
| ALMA INFANTE, | OBJECTIONS DUE WITHIN FOURTEEN DAYS |
| Defendant. | |

Plaintiff G & G Closed Circuit Events, LLC brings this action against Defendant Alma Infante for various claims arising from the purportedly unauthorized broadcast of a championship fight program in Defendant's restaurant.  (Compl., ECF No. 1.)  This matter is not set for trial. Currently before the Court is Defendant's motion for summary judgment.  (ECF No. 14.)  The matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c)(7).

A hearing on the motion was held on December 15, 2021.  Counsel Thomas Peter Riley, Jr. appeared by videoconference for Plaintiff.  Counsel Matthew Pare appeared by videoconference for Defendant.  Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, the arguments presented at the December 15, 2021

1

hearing, as well as the Court's file, the Court issues the following findings and recommendations to grant in part and deny in part Defendant's motion for summary judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff is a "closed-circuit distributor" of sports and entertainment programming.[2] (Aff. of Nicolas J. Gagliardi ("Gagliardi Aff.") ¶¶ 3, 11, ECF No. 16.)  Plaintiff was granted the exclusive nationwide commercial distribution rights to the Gennady Golovkin v. Sergiy Derevyanchenko Championship Fight Program (the "Program"), which was telecast nationwide on Saturday, October 5, 2019. (Compl. ¶ 16; Gagliardi Aff. ¶ 3.)  Plaintiff claims the Program originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies to Plaintiff's sub-licensees.  (Compl. ¶ 20; Gagliardi Aff. ¶ 11.)  "If a commercial establishment was authorized by Plaintiff to receive the Program, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal, or the establishment's programming provider would be notified to unscramble the reception of the Program for the establishment, depending upon the establishment's equipment and programming provider."  (Gagliardi Aff. ¶ 11.)  Plaintiff acknowledges the Program was lawfully available through various methods, "including cable, satellite, and streaming."  (Id. at ¶ 12.)

El Galeron De Carnitas is a local restaurant located at 1524 Center Avenue, Dos Palos, CA 93620 (the "Restaurant").  (Compl. ¶ 7; Decl. of Alma Sosa Infante ("Infante Decl.") ¶ 2, ECF No. 14-2; ECF No. 15-1 ¶ 1.)  Defendant is the owner of the Restaurant, as also identified on the California Department of Alcoholic Beverage Control License for the Restaurant.  (Compl. ¶¶

---

[1] The facts in this case are largely undisputed.  However, to the extent Plaintiff and Defendant attack each other's recitation of facts, this Court is not bound by either party's characterization of the evidence and instead independently reviews the record and any relevant legal authority to determine whether summary judgment is appropriate.  Only the facts sustained by the record are recounted herein.  For ease of reference, the Court will refer to the ECF pagination for the parties' attached exhibits.

[2] In his affidavit, Mr. Gagliardi explains the term "closed-circuit distributor" originates from the time in which sporting events were exhibited to viewers at venues (such as theaters, armories, banquet halls, and auditoriums) that were leased and the television broadcast signal of the event being exhibited at those venues was transmitted on a closed-circuit basis.  (Gagliardi Aff. ¶ 11.)

7–8; Infante Decl. ¶ 2; ECF No. 15-1 ¶ 2.)

Defendant was working at the Restaurant on October 5, 2019, at the time the Program was broadcasted.  (Infante Decl. ¶ 2; ECF No. 15-1 ¶ 4.)  Defendant did not purchase a commercial license from Plaintiff to broadcast the Program.  (Gagliardi Aff. ¶¶ 3, 7; ECF No. 18 ¶ 6.)  Of the "three flat screen tv's" and the "tv's spread throughout the establishment," the Program was displayed on "one tv behind the bar/counter and one other smaller TV" at the Restaurant.  (Aff. of Jeff Kaplan ("Kaplan Aff."), ECF No. 14-5 and 15-3.)   A post on the Restaurant's public Facebook page that was posted on October 5, 2019 advertised the Program would be shown at the Restaurant that day.  (Infante Decl. ¶ 3; Decl. of Ruben Oseguera ("Oseguera Decl.") ¶ 3; ECF No. 15-1 ¶ 7; Pl's. Ex. 3, ECF No. 15-5.)  However, Defendant did not charge any cover for admission into the Restaurant at the time the Program was on.  (Infante Decl. ¶ 5; Oseguera Decl. ¶ 5; ECF No. 15-1 ¶ 10.)  Nor were any customers present at the Restaurant during the time of the Program.  (Infante Decl. ¶ 5; Oseguera Decl. ¶ 5; Kaplan Aff. at 2.)

The Program was displayed at the Restaurant through an Internet streaming application called DAZN.  (Infante Decl. ¶ 3; Oseguera Decl. ¶ 3, ECF No. 14-3; ECF No. 15-1 ¶¶ 5–6.)  The DAZN subscription belonged to Defendant's boyfriend, Ruben Oseguera.  (Oseguera Decl. ¶ 3; ECF No. 15-1 ¶ 7.)  Nothing in the record indicates whether Mr. Oseguera was an employee or a patron of the Restaurant that day.

Plaintiff claims Defendant specifically directed or permitted the employees of El Galeron De Carnitas to unlawfully intercept, receive, and publish Plaintiff's Program at the Restaurant, or intentionally intercepted, received, and published the Program at the Restaurant herself.  (Compl. ¶ 11.)  Defendant and Mr. Oseguera both aver they did not realize there was anything illegal, wrong, or otherwise improper for the Restaurant to use its Internet signal to stream the Program through Mr. Oseguera's DAZN account.  (Infante Decl. ¶ 4; Oseguera Decl. ¶ 4.)  Without further explanation, Defendant avers that "[n]o cable television signal was used to view the subject Program, and no satellite signal was used. . . ."  (Infante Decl. ¶ 3.)

Plaintiff initiated this action on October 1, 2020.  (ECF No. 1.)  The complaint asserts federal claims for violations of 47 U.S.C. §§ 605 and 553 (Counts I and II), and state law claims

for conversion and violations of California Business and Professions Code§§ 17200 et seq. (Counts III and IV).  (Id.)  Plaintiff seeks statutory damages in the amount of $110,000 and attorneys' fees and costs.  (Id.)

On September 1, 2021, Defendant filed the instant motion for summary judgment, initially setting the hearing date for September 30, 2021.  (ECF No. 14.)  Plaintiff opposed the motion on September 16, 2021 but did not file the Gagliardi affidavit until September 24, 2021, approximately eight days late and the day after Defendant's reply briefing was due.  (ECF No. 15 (opposition); ECF No. 16 (Gagliardi Aff).)  Consequently, Defendant filed a reply in response to Plaintiff's separate statement of facts in support of its opposition to Defendant's motion for summary judgment on October 18, 2021, also late.[3]  (ECF No. 18.)  The reply appears to only dispute certain facts raised in Plaintiff's separate statement of facts and does not address Plaintiff's legal arguments made in opposition to the motion for summary judgment.  (See id.)

On October 15, 2021, the district judge referred the matter to the magistrate judge for the preparation of findings and recommendations.  (ECF No. 17.)  The Court reset the hearing on the motion for November 10, 2021, but subsequently continued the hearing to December 15, 2021, pursuant to the parties' stipulated request.  (ECF Nos. 19, 21, 22.)

**II.**

**LEGAL STANDARD**

The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita), 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others."  Conte v. Jakks Pac., Inc., 981 F. Supp. 2d 895,

---

[3] The Court notes that neither party submitted an explanation for their untimely filings; nor did the parties seek to modify the scheduling order so as to permit the filings.  Nevertheless, as Defendant had an opportunity to reply to Plaintiff's late filing and did file a response, the Court will consider the parties' filings herein.

902 (E.D. Cal. 2013) (quoting <u>Barker v. Norman</u>, 651 F.2d 1107, 1123 (5th Cir. 1981)); <u>see also</u> <u>Robi v. Five Platters, Inc.</u>, 918 F.2d 1439 (9th Cir. 1990); <u>Cheng v. Comm'r Internal Revenue</u> <u>Serv.</u>, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial."  <u>First Nat'l Ins. Co. v. F.D.I.C.</u>, 977 F. Supp. 1051, 1055 (S.D. Cal. 1977).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett (Celotex)</u>, 477 U.S. 317, 323 (1986).  To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc. (Nissan Fire)</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  <u>Nissan Fire</u>, 210 F.3d at 1102–03; <u>see</u> <u>Adickes</u>, 398 U.S. at 160.  If, however, a moving party carries its burden of production, the burden then shifts to the nonmoving party to establish that a genuine issue as to any material fact actually does exist.  <u>Matsushita</u>, 475 U.S. at 585–87.

In the endeavor to establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor but need only show the claimed factual dispute "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial."  <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288–89 (1968).  Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  Similarly, the nonmoving party may not merely rely upon the mere allegations or denials of its pleadings or "show that there is some metaphysical doubt as to the material facts," but must instead tender

evidence of specific facts in the form of affidavits and/or admissible discovery material, in support of its contention that the dispute exists.  Matsushita, 475 U.S. at 586; Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(c), (e)). Finally, the nonmoving party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 251–52.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed. R. Civ. P. 56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence of the nonmoving party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the nonmoving party.  Anderson, 477 U.S. at 255.  Nevertheless, mere disagreement as to legal implications of the material facts does not bar summary judgment.  See Beard v. Banks, 548 U.S. 521, 530 (2006).  Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  Nissan Fire, 210 F.3d at 1103; see also Celotex, 477 U.S. at 322.

**III.**

**DISCUSSION**

Although Plaintiff asserts federal and state claims, Defendant's motion for summary judgment only addresses the two federal claims.  The Court will address these claims accordingly. The material facts in this case are undisputed.  Defendant does not dispute that the Program was played at the Restaurant, nor does she dispute she did not pay Plaintiff for a commercial broadcast license.  Instead, Defendant moves for summary judgment on the basis that the Program was streamed at the Restaurant through Mr. Oseguera's subscription to the Internet streaming application DAZN, that neither §§ 605 nor 553 contemplates the Internet, and therefore both

statutes are inapplicable here.  Plaintiff does not dispute that Defendant used the Internet streaming service DAZN but argues liability nevertheless attaches under §§ 605 and 553 because the statutes require expansive construction, they prohibit unauthorized broadcasts, and Defendant broadcast the Program in her restaurant without Plaintiff's authorization.  Thus, the main issue presented is whether Defendant's streaming of the Program over the Internet constitutes a valid defense to Plaintiff's clams under §§ 553 and/or 605 (i.e., the "Internet defense").  Accordingly, the Court will address this issue first, then evaluate Defendant's remaining arguments.

### A.   Application of the Internet Defense to Claims Under 47 U.S.C. §§ 605 and 553

#### 1.   Plaintiff's Claims

Plaintiff's primary causes of action arise under the Communications Act of 1934, 47 U.S.C. § 605 ("§ 605"), and the Cable Communications Act of 1984, 47 U.S.C. § 553 ("§ 553").[4] Section 553 holds that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law."[5]  47 U.S.C. § 553(a)(1).  Section 605 "prohibits commercial establishments from intercepting and broadcasting to its patrons satellite cable programming."  Kingvision Pay-Per-View v. Guzman, No. C 09-00217 CRB, 2009 WL 1475722, at *2 (N.D. Cal. May 27, 2009) (citing 47 U.S.C. § 605(a)); DIRECTV, Inc. v. Webb (Webb), 545 F.3d 837, 844 (9th Cir. 2008) (holding satellite television signals are covered communications under § 605(a)).

##### a.   47 U.S.C. § 553

As an initial matter, the Court notes that caselaw suggests a plaintiff may not simultaneously pursue relief under both sections of the Act, because they target two distinct types of piracy.  See J & J Sports Prods., Inc. v. Torres, No. 2:11-cv-00653 JAM KJN, 2011 WL

---

[4] Plaintiff's remaining two causes of action arise under California law for conversion and violations of California Business and Professions Code §§ 17200 et seq.  These state law claims arise from the same set of facts asserted herein and are largely derivative of the federal claims.  As noted, however, Defendant does not address the state law claims in her motion for summary judgment and the Court will not consider them herein.

[5] Section 553 additionally provides that, for purposes of subsection (a)(1), the term "assist in intercepting or receiving" includes "the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1)."  47 U.S.C. § 553(a)(2).

6749817, at *4 (E.D. Cal. Dec. 22, 2011) (collecting cases); J & J Sports Prods., Inc. v. Man Thi Doan, No. C-08-00324 RMW, 2008 WL 4911223, at *2 (N.D. Cal. Nov. 13, 2008) ("A signal pirate violates section 553 if he intercepts a cable signal, he violates section 605 if he intercepts a satellite broadcast.  But he cannot violate both by a single act of interception."); Joe Hand Promotions, Inc. v. Albright (Albright), No. 2:11-2260 WBS, 2013 WL 2449500, at *4 (E.D. Cal. Jun. 5, 2013) (quoting J & J Sports Prods., Inc. v. Manzano, No. C-08-01872 RMW, 2008 WL 4542962, at *2 (N.D. Cal. Sept. 29, 2008) (same)); see also TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 200–07 (3d Cir. 2001) (applying Congressional intent to determine coverage of §§ 605 and 553, and therefore applicable remedies, are mutually exclusive); Cablevision of Michigan, Inc. v. Sports Palace, Inc., 27 F.3d 566 (Table) (6th Cir. 1994) ("In light of the legislative history, Section 605(a) may be read as outlawing satellite signal piracy, while Section 553 bans only the theft of programming directly from a cable system."); United States v. Norris, 88 F.3d 462, 469 (7th Cir. 1996) ("The only plausible, consistent interpretation of [the legislative history regarding §§ 605 and 553] is that Congress intended for § 605 to apply to the unlawful interception of cable programming transmitted through the air, while it intended for § 553 to apply to the unlawful interception of cable programming while it is actually being transmitted over a cable system.").

Plaintiff maintains in its oppositional briefing that the ultimate reach of §§ 605 and 553 have not been adjudicated in the Ninth Circuit (ECF No. 15 at 3); nevertheless, Plaintiff conceded at the hearing on Defendant's motion that it could only recover damages based on either a violation of §§ 605 or 553 and elected to proceed with its claim as arising pursuant to § 605.  The Court will therefore recommend that Defendant's motion be granted with respect to Plaintiff's claim under § 553 (Count II).[6]  The Court next turns to Plaintiff's claim under § 605.

**b.    47 U.S.C. § 605**

Subdivision (a) identifies the practices prohibited under § 605.  Under this section, the

---

[6] In making this recommendation, the Court does not express any opinion as to the viability of the dismissed § 553 claim or the comparative degrees of likelihood of success on the merits between the two claims as, presumably, Plaintiff's election was made pursuant to a legal strategy borne of Plaintiff's familiarity with the facts of this case following diligent completion of all necessary discovery.

following practices are prohibited:

> [1] Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a [subpoena] issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.
>
> [2] No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.
>
> [3] No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.
>
> [4] No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a).

Importantly, the Ninth Circuit has held "liability under section 605 requires proof that a defendant has (1) intercepted or aided the interception of, and (2) divulged or published, or aided the divulging or publishing of, a communication transmitted by the plaintiff." Cal. Satellite Sys. v. Seimon, 767 F.2d 1364, 1366 (9th Cir. 1985) (internal quotations and citations omitted).

Subsection (b) identifies exceptions to liability, under which § 605(a) "shall not apply to the interception or receipt by any individual, or the assisting (including the manufacture or sale) of such interception or receipt, of any satellite cable programming for private viewing."[7]

---

[7] Section 605(c) prohibits the encryption of "satellite delivered programs included in the National Program Service of the Public Broadcasting Service and intended for public viewing by retransmission by television broadcast stations." Section 605(d) contains definitions for the purposes of § 605, and finally, § 605(e) authorizes penalties and remedies

9

Specifically, situations in which:

> (1) the programming involved is not encrypted; and

> (2)(A) a marketing system is not established under which--

>> (i) an agent or agents have been lawfully designated for the purpose of authorizing private viewing by individuals, and

>> (ii) such authorization is available to the individual involved from the appropriate agent or agents; or

> (B) a marketing system described in subparagraph (A) is established and the individuals receiving such programming has obtained authorization for private viewing under that system.

47 U.S.C. § 605(b).

Also relevant to § 605, the Communications Act provides the following definitions for radio and wire communications:

> **(40) Radio communication**

> The term "radio communication" or "communication by radio" means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

> . . .

> **(59) Wire communication**

> The term "wire communication" or "communication by wire" means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

47 U.S.C. §§ 153(40), (59).  Following the 1984 amendment to § 605 and enactment of § 553, the Ninth Circuit has unambiguously held that § 605 includes satellite television signals:

> [§ 605 ] does not specifically reference satellite communications because, . . . [w]hen the original provision was written, . . . the business of direct-to-home satellite broadcasting did not exist.  Still, it is clear from the case law since the 1984 amendments [to the Communications Act] that the "communications" protected by §

for statutory violations.  47 U.S.C. §§ 605(c)–(e).

605(a) include satellite television signals.

DirecTV, Inc. v. Webb, 545 F.3d 837, 844 (9th Cir. 2008) (citing Nat'l Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 911 (6th Cir. 2001); and Sosa v. DIRECTV, Inc., 437 F.3d 923, 926 (9th Cir. 2006)).  Indeed, among the definitions added "[f]or purposes of [§ 605]" by the 1984 amendment is the term "satellite cable programming," which also indicates satellite transmissions were meant to be covered under § 605.[8]  See 47 U.S.C. § 605(d)(1).

Plaintiff claims Defendant violated § 605 when she "intercepted, received and published the Program" at her Restaurant without Plaintiff's authorization.  (Compl. ¶¶ 21–22; Gagliardi Aff. ¶ 11.)  Plaintiff further claims § 605 is implicated because the Program originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies to Plaintiff's sub-licensees.  (Compl. ¶ 20; Gagliardi Aff. ¶ 11.)

### 2.   Defendant's Internet Defense Argument

As previously noted, it is undisputed that the Program was streamed over the Internet via Mr. Oseguera's DAZN subscription.  In moving for summary judgment, Defendant argues that a signal received via the Internet constitutes neither a satellite TV transmission nor a cable TV transmission; therefore, it falls outside the coverage of the alleged TV signal piracy statutes (§§ 605 and 553).  (ECF No. 14 at 4–5.)  This conclusion is necessarily premised upon several discrete contentions: (1) that Congress did not intend for §§ 605 or 553 to encompass any type of signal other than those expressly identified in the statutes (or as interpreted by controlling legal precedent) — i.e., satellite or cable; (2) that the Internet is categorily different from satellite and cable; and relatedly, (3) that only the manner in which the signal is acquired/received is pertinent to §§ 605 or 553.

Plaintiff argues Defendant's legislative intent argument is flawed and that, rather, the statutes were meant to be interpreted expansively so as to encompass developing technologies such as the Internet.  Thus, Plaintiff takes issue with the first of Defendant's underlying premises.  Plaintiff also disputes the third underlying premise by arguing that whether the Program was

---

[8] "[T]he term 'satellite cable programming' means video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers."  47 U.S.C. § 605(d)(1).

1   ultimately broadcast at the Restaurant via the Internet is irrelevant because "the relevant question

2   [regarding applicability of §§ 605 and 553] is not what type of system is used to intercept the

3   broadcast, but rather the type of broadcast being intercepted."  (ECF No. 15 at 6.)  To this point,

4   Plaintiff argues that liability attaches in the present case because the at-issue Program originated

5   via satellite uplink and was subsequently re-transmitted via cable systems and satellite companies

6   to Plaintiff's sub-licensees.   Further, Plaintiff argues that because Defendant did not have

7   authority to commercially broadcast the Program, she violated § 605.

8        As an initial matter, the Court acknowledges the specific question of whether Internet

9   streaming is covered under § 605(a) has not been directly addressed by the Ninth Circuit (or

10   many other circuit courts).[9]   Moreover, there is a wide split of authority amongst the district

11   courts across the circuits with respect to whether § 605(a) applies to Internet streaming.

12   Defendant urges the Court to adopt the reasoning articulated by the district courts that have

13   determined § 605 does not encompass the Internet, while Plaintiff argues cases in which the

14   courts reach the opposite conclusion are more apposite and better-reasoned.  (ECF No. 14 at 4–6;

15   ECF No. 15 at 3–11.)  The Court will therefore analyze the parties' arguments with respect to the

16   authority split on this issue, as well as examine the statutory construction of § 605 to determine

17   whether Internet streaming is covered under § 605.

18        **a.   Defendant's Supporting Cases**

19        Notably, Defendant provides scant legal analysis in support of her Internet defense

20   argument and instead merely lists several string cites of cases, often without an appropriate

21   citation, that purportedly support her argument.   Nevertheless, an independent review by the

22   Court reveals Defendant's cases favoring an Internet-streaming defendant tend to apply one of

23   two divergent lines of reasoning: (1) cases that find the Internet is not at all implicated by §§ 605

---

24

25   [9] Plaintiff has, however, appealed a number of cases in which the district court granted the defendant's motion for
summary judgment on the basis that Internet streaming was not expressly covered under § 605(a) and the finding that
26   the defendant had streamed a program through an internet application/subscription.   These cases are currently
pending before the Ninth Circuit for review.  See, e.g., G & G Closed Cir. Events, LLC v. Olson, No. 20cv02119-
27   LAB-BGS, 2021 WL 4267409 (S.D. Cal. Sept. 20, 2021) (appeal filed Oct. 18, 2021, 9th Cir. No. 21-56137); G & G
Closed Circuit Events, LLC v. Michael Reto, No. CV 19-07915 WDK-JC, 2021 WL 4468161 (C.D. Cal. Sept. 3,
28   2021) (appeal filed Sept. 28, 2021, 9th Cir. No. 21-56055); G & G Closed Cir. Events, LLC v. Liu, No. CV 19-07896
WDK-JC, 2021 WL 4394600 (C.D. Cal. Sept. 3, 2021) (appeal filed Sept. 24, 2021, 9th Cir. No. 21-56047).

or 553 because Internet transmissions are categorially different from radio/satellite and cable transmissions; and (2) cases that support the contention that the Internet is distinct from satellite and cable but mainly focus instead on the independent finding that no "interception" of communications has occurred under §§ 605 or 553 where the program is essentially "re-transmitted" after receipt via the Internet.

The first line of cases applying the Internet defense provide little explanation for doing so, other than to state in fairly conclusory fashion that the Internet is a distinct technology from radio/satellite and cable.  These cases note the Internet did not exist in 1934 when § 605 was first enacted, and therefore could not have been contemplated at that time.  They also assert "the statutory language [of §§ 605 and 553] is unambiguous and does not support an interpretation that includes signals besides radio, satellite, and cable."   Further, these cases note that, even though the Internet has been in wide usage since the mid-1990s, the legislature has not amended either §§ 605 or 553 to expressly include transmissions via the Internet; thus, Congress did not intend for §§ 605 or 553 to encompass Internet transmissions.  See, e.g., G & G Closed Circuit Events, LLC v. Samusick, No. 2:18-cv-01796-WDK-JC (C.D. Cal. 2018) (minutes from in-chambers hearing indicating the court granted defendant's motion for summary judgment based on the Internet defense and denied plaintiff's cross-motion for summary judgment where the defendant broadcast plaintiff's program in her hotel via the Internet streaming device, Amazon Firestick); J & J Sports Prods., Inc. v. Thompson, No. ED CV 16-01939 WDK-PLA, 2019 WL 13039884 (C.D. Cal. Sept. 20, 2019) (granting defendants' motion for summary judgment based on the Internet defense where defendants live-streamed plaintiff's program at their restaurant via the Internet using a laptop computer); G & G Closed Cir. Events, LLC v. Espinoza, No. CV 18-07894 WDK-JC, 2020 WL 7861971 (C.D. Cal. Oct. 5, 2020) (granting defendants' motion for summary judgment where defendants purchased and then exhibited plaintiff's program via the Internet using a Sony PlayStation); G & G Closed Cir. Events, LLC v. Rojas, No. ED CV 18-00438 WDK-JC, 2020 WL 7861979 (C.D. Cal. Oct. 5, 2020) (granting defendants' motion for summary judgment where defendants purchased plaintiff's program over the Internet through the website Flipps.com and used a laptop computer to view the program); G & G Closed Cir. Events, LLC v.

Snukal, No. CV 19-07854 WDK-JC, 2021 WL 4527769 (C.D. Cal. Apr. 16, 2021) (granting defendants' motion for summary judgment where defendants live-streamed plaintiff's program via the Internet website www.fight.com).

In the second, alternative line of cases favorable to defendants who used the Internet to display pay-per-view sports programming, rather than focus on the perceived distinction between the Internet and satellite/cable technologies, the courts evaluate whether an "interception" within the meaning of §§ 605 or 553 occurred where the defendant received the program from a third-party and merely "re-transmitted" the at-issue programming signal.  See, e.g., Joe Hand Promotions Inc. v. Spain, No. CV-15-00152-PHX-SMM, 2016 WL 4158802 (D. Ariz. Aug. 5, 2016); Zuffa, LLC v. Justin.tv, Inc. (Zuffa), 838 F. Supp. 2d 1102 (D. Nev. 2012); Ark Promotions, Inc. v. Justin.tv, Inc. (Ark Promotions), 904 F. Supp. 2d 541 (W.D.N.C. 2012).

In Zuffa and Ark Promotions, for example, the respective courts both granted the defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) on the basis that the plaintiffs failed to allege sufficient facts showing a violation under §§ 605 or 553.  The defendants in Zuffa and Ark Promotions were website operators that permitted their users to stream or broadcast live video across the Internet to other users of the websites.  The Zuffa dismissal tended to focus less on the "Internet defense" and more on the defendant's lack of a relationship with the original cable or satellite signal.  More specifically, the court determined the defendant did not actually "intercept or receive" any cable or satellite broadcast as contemplated under §§ 605 or 553; rather, it was the defendant's users who received the signal, copied the plaintiff's program, and then rebroadcast it over the Internet via the defendant's website.  The Zuffa court opined the legislative histories of §§ 605 and 553 indicated the statutes were designed to regulate cable and satellite service theft, usually through the use of content descramblers or establishment owners extending their cable/satellite purchases beyond their authorized limits (citing H.R. Rep. No. 98–934, 84, reprinted in 1984 U.S.C.C.A.N. 4655, 4721), but that Congress did not intend to extend liability under the Communications Act to cover streaming services that merely receive and store content uploaded by their users.  Under these circumstances, the Zuffa court found §§ 605 and 553 did not apply to the defendant website operators.

14

Similarly, in Ark Promotions, users of the defendant's website who had authorized access to the plaintiff's broadcast signal simultaneously re-transmitted the live video stream through the defendant's website.  As relevant here, the plaintiff alleged the live video streams of the program that were retransmitted to and rebroadcasted from defendant's website were unauthorized and asserted claims against the defendant website under §§ 605 and 553 for the unauthorized broadcast of its program.  The Ark Promotions court granted the defendant's motion to dismiss based on the finding that §§ 605 and 553 only apply to the interception of a plaintiff's *original* signal; they do not apply where an intermediary party receives the cable or satellite communication and then takes some action to rebroadcast or retransmit that communication to another party.  Notably, the Ark Promotions court indicated such a finding would apply regardless of whether the retransmission was delayed "by minutes or seconds," or was purportedly "simultaneous."  The court further noted the plaintiff failed to allege that the defendant's users were not authorized to receive the broadcast, or that the defendant had any access to the broadcast signal by radio, cable, or satellite.

Finally, Spain cited Zuffa and Ark Promotions with approval and essentially analogized the "re-transmission" defense articulated in Zuffa and Ark Promotions to an individual defendant who exhibited the plaintiff's program at his martial arts studio via the Internet using an Xbox device, after purchasing the program from the third-party website UFC.tv.  Spain granted the defendant's motion for summary judgment based on the finding that §§ 605 and 553 were inapplicable to Internet streaming — which is the only issue referenced by both Plaintiff and Defendant with respect to this case.  (See ECF No. 14 at 5; ECF No. 15 at 5.)  However, while Spain provided scant discussion with respect to its Internet defense finding, the court devoted much more analysis to the issue of re-transmission of the plaintiff's program.  For example, the Spain court found that UFC was an authorized distributor of the program, that the defendant lawfully purchased the program from UFC, and that there was no evidence of unauthorized signal reception or interception or that the program was used for an unauthorized purpose.  Indeed, the Spain court pointedly noted that, if anything, issues of breach of contract and licensing might exist (rather than TV piracy under §§ 605 and 553), and even suggested in a footnote that

standing might have been an issue, though the court acknowledged standing was not raised by the parties and it declined to address the issue in light of its other dispositive findings.

Regardless, Defendant appears to focus her argument exclusively under the Internet defense as set forth in the first line of reasoning by the cases — that is, the contention that Internet transmissions are "categorically different" from wire radio and satellite — and does not appear to directly raise any argument pursuant to the second line of reasoning asserted in some of the Internet cases, even though she cites to them.   Indeed, Defendant only cites the aforementioned cases for the premise that the court should adopt the Internet defense.[10]   At the hearing, Defendant reiterated this position.   Consequently, based on Defendant's arguments — both in her briefings and at the hearing on the motion — the Court declines to evaluate arguments not raised and only considers Defendant's motion for summary judgment based on the purported "Internet defense."

### b.    Plaintiff's Supporting Cases

Plaintiff, by contrast, argues the Court should adopt the line of reasoning asserted in the cases which either directly reject the Internet defense or otherwise find the defendants liable under §§ 605 or 553 in cases "involving an internet provider" on the basis that these cases provide more in-depth analysis, are more current, and are more applicable to the instant case.   (See ECF No. 15 at 3–9 (citing G & G Closed Circuit Events, LLC v. Gonzalez Ruiz (Gonzalez Ruiz), 379 F. Supp. 3d 1061 (S.D. Cal. 2019); J & J Sports Prods., Inc. v. Jaschkowitz (Jaschkowitz), No. 5:14-CV-440-REW, 2016 WL 2727015 (E.D. Ky. May 6, 2016); G&G Closed Cir. Events LLC v. Alexander (Alexander), No. CV-18-02886-PHX-MTL, 2020 WL 1904628 (D. Ariz. Apr. 17, 2020); Innovative Sports Mgmt. Inc. v. Singh (Singh), No. CV-18-02211-PHX-MTL, 2020 WL 2084570 (D. Ariz. Apr. 30, 2020); G & G Closed Cir. Events LLC v. Montoya (Montoya), No. CV-20-00834-PHX-SPL, 2021 WL 3190726 (D. Ariz. Jul. 28, 2021); J & J Sports Prods., Inc. v.

---

[10] For example, the parties only discuss Joe Hand Promotions, Inc. v. Cusi, No. 3:13-cv-935-MMA-BLM, 2014 WL 1921760 (S.D. Cal. May 14, 2014), with respect to whether §§ 605 and 553 apply to programs received and displayed over the Internet.  The Court notes Cusi only pertains to a § 553 claim.  The Court further notes that Cusi cites Ark Promotions with approval, apparently for the premise that §§ 605 and 553 were not intended to apply to a party who receives a second-hand transmission from a user who received or intercepted a broadcast signal from a cable or satellite provider.  Neither party addresses this portion of the court's order.

1   Vega (Vega), No. 5:15-CV-5199, 2016 WL 4132290 (W.D. Ark. Aug. 2, 2016)).

2          Of the cases cited by Plaintiff, Jaschkowitz provides the most analysis with respect to

3   application and scope of § 605.   In Jaschkowitz, the boyfriend of one of the defendants'

4   employees showed the plaintiff's program at the defendants' bar "in a delayed manner from the

5   Internet using a smart phone connected to the projection television in [the bar]."   Jaschkowitz,

6   2016 WL 2727015, at *1, *3.  The plaintiff claimed the defendants "without authorization and

7   without purchasing a commercial license . . . intercepted, received, published, divulged and/or

8   exhibited the program at [the defendants' bar] . . . ."  Id.  Relying on the Sixth Circuit's ruling in

9   Nat'l Satellite Sports, Inc., the Jaschkowitz court found § 605 "applies centrally (but not

10  exclusively) to satellite transmissions" and "includes such prohibited practices as the *divulgence*

11  of wire or radio communications by persons authorized to receive them to others who are not so

12  authorized, and the interception of any radio communication by a person not authorized to receive

13  that communication from the sender."   Jaschkowitz, 2016 WL 2727015, at *2–3 (emphasis in

14  original, citing Eliadas, 253 F.3d at 907, 913–14).   Applying the Sixth Circuit's broad scope

15  interpretation of § 605, the court concluded the defendants violated sentence one of § 605(a)

16  because (1) they published a wire communication to their patrons and (2) the divulgence was

17  unauthorized.   Id. at *1, *3–4.  Accordingly, the court granted the plaintiff's cross-motion for

18  summary judgment as to its § 605 claim.[11]   Id. at *1.

19          Quoting the Jaschkowitz court's discussion of § 605, the Gonzalez Ruiz court denied the

20  defendant's motion for summary judgment premised on the Internet defense, which the court

21  characterized as "the question of whether either [§§ 605 or 553] applies when a program is shown

22  without authorization via the internet."  Gonzalez Ruiz, 379 F. Supp. 3d at 1065–66.  In Gonzalez

23  Ruiz, after a customer showed the defendant how to hook his projector to a computer and get a

24  signal on the Internet, the defendant showed the program in his bar via the Internet.  Id. at 1066.

25  Finding these facts to be "materially identical" to those in Jaschkowitz, the Gonzalez Ruiz court

26  echoed Jaschkowitz in holding that, "[r]egardless of whether [the defendant] had personal

27  _____

28  [11] The court granted the defendants' motion for summary judgment as to plaintiff's § 553 claim, after finding that the
plaintiff, as a matter of election, had abandoned the claim.  Id. at *2 n.2.

permission to receive and view the Program over the internet (a question that the Court does not decide here), there was no authorization to display the Program to other patrons at [the restaurant]. The display of the Program via projection television at [the restaurant] therefore, at a minimum, violates § 605." Id.

Plaintiff also argues Alexander postdates Defendant's Spain case, reversing the District of Arizona's former position that §§ 605 and 553 do not apply to Internet streaming and directly rejecting the Internet defense. Alexander, 2020 WL 1904628. In Alexander, the defendants used an Amazon Firestick purchased from and installed by a third-party IT consultant to stream the plaintiff's program at their restaurant. The court rejected the defendants' argument that § 605 was inapplicable because the program was received via the Internet, focusing instead on the finding that the signal the defendants intercepted with their streaming service was a satellite signal, and the portion of § 605(a) that prohibits the "unauthorized receipt and use of radio communications for one's own benefit or for the benefit of another" was dispositive. The court reasoned the defendants violated § 605 because, "it does not matter that Defendants obtained the programming by pulling it from an internet source rather than by, for example manipulating hardware to using a counterfeit access card . . . their use was unauthorized and for their financial benefit, plain and simple." Thus, for purposes of applying § 605, the Alexander court looked to the nature of the original signal intercepted, not the technology used to intercept it.

Finally, Montoya, the most recent case arising from the Arizona District Court, further develops the Alexander court's shift of focus in the § 605 analysis from the technology used to receive the signal to the type of signal originally transmitted. Montoya, 2021 WL 3190726. In Montoya, as here, the defendants used the Internet streaming app/device DAZN to broadcast the plaintiff's program. The defendants moved for summary judgment based on the Internet defense, and the plaintiff submitted evidence that its program "originated via satellite uplink" and was "subsequently re-transmitted to cable systems and satellite companies to plaintiff's sub-licensees." Based on language in Spain and Alexander, the Montoya court concluded "the relevant question is not what type of system is used to intercept the broadcast, but rather the type of broadcast being intercepted," and thus denied the defendants' motion for summary judgment.

1   Id. at *2.

2          c.      **Analysis of the Parties' Respective Positions and Cases**

3          Plaintiff argues its cases are factually apposite to the instant matter, therefore the Court

4   should apply the same reasoning as the courts in these cases and reach the same ruling: denial of

5   Defendant's motion for summary judgment.   In distinguishing the cases cited by Defendant,

6   Plaintiff argues the Internet defense line of cases should not be adopted here because they

7   represent an outlier of opinions, are mostly unpublished, and are non-binding.   More specifically,

8   as Plaintiff accurately notes, the majority of opinions cited by Defendant asserting this line of

9   reasoning arise from the Central District of California and were issued by the same District Judge

10  (the Honorable William D. Keller).   (See ECF No. 15 at 3.)   As previously noted, Defendant filed

11  a reply to dispute certain statements in Plaintiff's separate statement of facts after the late-filed

12  affidavit was submitted, but Defendant's reply did not address Plaintiff's oppositional arguments.

13         It may be noted, however, that Plaintiff's main objections to Defendant's cases may be

14  similarly applied to its own citations; namely, none of Plaintiff's cases are binding either, the

15  majority are unpublished, and a few arise from the same district court (and same district judge) in

16  Arizona.   Indeed, it appears the cases on which Plaintiff most heavily relies arise from

17  Jaschkowitz, a hardly-"recent" 2016 case arising from the Eastern District of Kentucky: Gonzalez

18  Ruiz, the only case Plaintiff cites that arises from a California district court and addresses the

19  Internet issue, heavily relies on Jaschkowitz; Montoya, a District of Arizona case, relied heavily

20  on Gonzalez Ruiz; and the rulings in Alexander and Singh, also District of Arizona cases, were

21  both issued by the same District Judge (the Honorable Michael T. Liburdi).

22         Regardless, the Court finds neither party — nor the cases, as relied upon by the parties —

23  to be wholly persuasive.   Of the cases that squarely address the Internet defense, the majority

24  appear to provide a fairly conclusory statement that §§ 605 and/or 552 do (or do not) encompass

25  Internet streaming, with only limited discussion of the Internet or the statutes.   In the Internet

26  defense cases arising from the Central District of California, for example, Judge Keller upheld the

27  Internet defense on the basis that §§ 605 and 553 did not apply to any signals "besides radio,

28  satellite, and cable."   See, e.g., Samusick, No. 2:18-cv-01796-WDK-JC; Thompson, 2019 WL

13039884; <u>Espinoza</u>, 2020 WL 7861971; <u>Rojas</u>, 2020 WL 7861979, <u>Snukal</u>, 2021 WL 4527769. The underlying premise upon which these rulings is necessarily based is that Internet broadcasts are categorically different from radio, satellite, and cable and can never be transmitted via radio, satellite, or cable signal so as to implicate §§ 605 or 553.  But these cases provide no discussion in support of this premise.

On the other side, <u>Gonzalez Ruiz</u> similarly does not articulate its basis for rejecting the Internet defense.  Instead, the court inserts a block quote of <u>Jaschkowitz's</u> holding, deems the facts "materially identical," and states, "the same conclusion is warranted here."  <u>Gonzalez Ruiz</u>, 379 F. Supp. 3d at 1066.  But this Court is unpersuaded that the facts in <u>Gonzalez Ruiz</u> were identical to those in <u>Jaschkowitz</u>.  Importantly, the <u>Jaschkowitz</u> court made a point of noting it was undisputed by the parties that the at-issue Internet transmission qualified as an "interstate communication by wire."  <u>Jaschkowitz</u>, 2016 WL 2727015 at *4 n.3.  In light of this material undisputed fact, which is not present in <u>Gonzalez Ruiz</u>, the <u>Jaschkowitz</u> court did not expressly address the issue of whether all Internet transmissions are categorically implicated under § 605. <u>Gonzalez Ruiz</u>, by contrast, does not indicate whether the parties discussed or disputed that the Internet signal was received by the defendant via satellite, cable, or some other technology, nor is there any discussion as to why the court deemed the Internet transmission to be covered by § 605. Thus, in ruling the defendant violated § 605 simply because "there was no authorization to display the Program to other patrons at [the restaurant]," the <u>Gonzalez Ruiz</u> court does not address how or why Internet streaming is covered by § 605.

The Court also notes a number of the cases cited by the parties do not address the Internet issue in any meaningful way and are therefore minimally persuasive in this respect.  <u>See</u>, <u>e.g.</u>, <u>Albright</u>, 2013 WL 2449500;[12] <u>Singh</u>, 2020 WL 2084570;[13] : <u>Vega</u>, 2016 WL 4132290;[14] Joe

---

[12] In <u>Albright</u>, the court granted summary judgment for plaintiff on its § 605 claim, finding the circumstantial evidence submitted by plaintiff was sufficient to support the reasonable inference that the defendant intercepted a satellite broadcast of the Program (in violation of § 605) and the plaintiff's material facts were undisputed.  To this point, the <u>Albright</u> court acknowledged the plaintiff's "circumstantial evidence could readily be controverted" but noted the defendant, nevertheless, did not offer any evidence "that the Program was received through some other method, such as over the internet."  2013 WL 2449500, at *5.  This Court declines to construe the <u>Albright</u> court's statement as an endorsement of the Internet defense, as Defendant contends, but rather an evaluation of the sufficiency of evidence within the context of plaintiff's burden on summary judgment and the potential for a defendant to create a triable issue of material fact to defeat summary judgment.

Hand Promotions, Inc. v. Maupin, No. 15-cv-06355 (ADS) (AKT), 2016 WL 6459631 (E.D.N.Y. Oct. 31, 2016).[15]

Furthermore, in seeking merely to establish a bright-line determination that the Internet is or is not contemplated by §§ 605 and/or 553, the Court finds the parties do not rely on cases which provide more thorough analyses of the pertinent issues, nor do they examine the more detailed, nuanced analyses that are presented in some of the cited cases.  For example, a significant number of cases determined liability existed under §§ 605 or 553, not by issuing a blanket statement that the Internet is covered under §§ 605 or 553, but by finding that the at-issue signal was either received through a radio/satellite or cable-based Internet system and/or initially transmitted by radio or cable.  See, e.g., J & J Sports Prods., Inc. v. Patel, 364 F. Supp. 3d 1368, 1370 (S.D. Ga. 2018) (evidence supported finding that internet connection used by defendants to receive plaintiff's program was by cable modem service, thus a "cable system" within the meaning of § 553); Zuffa, LLC v. Lavecchia, No. 20-00240 (SDW) (LDW), 2021 WL 1541030, at *2 (D.N.J. Apr. 20, 2021) ("[S]ections 553 and 605 provide for alternative forms of relief depending on how the defendant intercepted the program at issue — i.e., the interception of actual airborne satellite transmissions (section 605) or the interception of transmissions once they reach the cable system (section 553)."); and compare TKR Cable Co., 267 F.3d at 207 ("Once a satellite transmission reaches a cable system's wire distribution phase, it is subject to § 553 and is no longer within the purview of § 605.") with Internat'l Cablevision, Inc. v. Sykes (Sykes), 75 F.3d 123, 131 n.5 (2d Cir. 1996) (finding third sentence of § 605(a) encompasses all satellite-originated transmissions).

---

[13] Plaintiff cites to Singh as another Arizona case post-dating Spain, in which the defendants were deemed liable under § 605 despite use of the Internet.  Singh, however, does not discuss the Internet defense (or use of the Internet). Therefore, the Court does not find this case instructive with respect to the parties' Internet defense arguments.

[14] The Court is unpersuaded Vega is analogous to the instant matter to the extent that Vega pertains to the defendant's burden on a motion to file a third amended answer to plead new affirmative defenses, which required addressing the balancing factors of prejudice and undue delay in addition to establishing the merits of his proposed defenses.

[15] Maupin pertains to a motion to dismiss, a stage of litigation at which the court must accept all allegations as true: there the court denied the defendants' motion to dismiss based on the Internet defense because it found the plaintiff alleged sufficient facts to state a cause of action where it alleged that defendants used cable internet to directly intercept plaintiff's program, which was also transmitted via cable.

Importantly, the parties neglect entirely to examine the actual language of the statutes, their statutory framework, and their application to the instant undisputed facts, and only superficially address legislative history by relying on cases which provide a similarly limited analysis. The Court shall therefore examine these crucial points, and the relevant legal authorities as required to evaluate the application of the instant facts to Plaintiff's § 605 claim.

### i.   Discussion of the Internet

As an initial matter, the Court finds it noteworthy that neither party's briefing discusses what the Internet is or attempts to explain why it is "categorically distinct" (or not) from radio and cables, even though this appears to be the core underlying premise of the Internet defense.

The Court also addressed this issue at the hearing on the motion, by asking the parties to identify evidence regarding the at-issue Internet technology and to support a contention that such technology is or is not contemplated under § 605 based on what it is and how it functions. In response, Plaintiff conceded that the Internet is based on a technology distinct from radio or satellite. But Plaintiff argued this is not necessarily a basis for determining that § 605 is inapplicable, because the Internet is akin to satellite/radio transmissions in that an internet transmission "comes through like a radio wave, the signal is put out there much like a radio signal, and a computer pulls down the signal." Defendant acknowledged that an internet transmission was likely transmitted through wires/via satellite at some point, yet nevertheless argued that the Internet is a categorically different technology from cable and satellite because individuals must pay service providers separately for cable, satellite, and Internet. Neither party submitted any evidence or legal authority in support of these contentions.

Yet an independent review by the Court reveals myriad legal authority that is instructive on this point. For example, the United States Supreme Court has recognized that there are numerous ways to transmit data over the Internet, such as by cable modem service using cable lines, digital subscriber lines using local telephone wires, terrestrial-based wireless networks, and satellite-based wireless networks. Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs., 545 U.S. 967, 975 (2005). In 2003, the Ninth Circuit also examined the technology of cable internet with respect to its function under the Telecommunications Act of 1996 (47 U.S.C.

1 §§ 609 et seq.):

2 ["Dial-up" connections] use the wires owned by local telephone
3 companies to connect the user's computer to an Internet Service
Provider's ("ISP's") "point of presence," which in turn is connected
4 to the Internet "backbone."  Customers connecting to the Internet
via a traditional narrowband connection [rely on] the wires
5 connecting the user's computer to the ISP's point of presence . . . .

6 [R]esidential high-speed (or "broadband") Internet service allows
for much faster and easier use of the Internet, including streaming
7 audio and video. . . .  Currently, there are two principal "pipelines"
through which consumers can receive broadband access: digital
8 subscriber lines ("DSL") and cable lines.  [n.3]  DSL uses the same
copper wires employed in telephone service and dial-up access,
9 [n.4] while cable modem service uses the network of coaxial cable
employed to transmit television signals . . . In the case of DSL, an
10 ISP uses equipment located at the telephone company to transmit
Internet service to its subscribers.  In the case of cable modem
11 service, the connection to the Internet occurs at the "headend," or
the origination point for signals in the cable system . . .

12 [n.3: There are two other types of high-speed Internet access
available — satellite and fixed wireless . . . .]
13
[n.4: For a description of DSL technology, *see WorldCom, Inc. v.*
14 *FCC*, 246 F.3d 690, 692 (D.C. Cir. 2001) ("Packet-switching and
digital subscriber line technologies ("DSL") make it possible to
15 send data at high speed over conventional copper wire.  Two DSL
modems are attached to a telephone loop, one at the subscriber's
16 premises and one at the telephone company's central office.  If the
line carries both ordinary telephone service and high-speed data
17 transmission, the carrier must separate these streams at the
company's central office, using a digital subscriber line access
18 multiplexer.  With this device the carrier sends ordinary voice calls
to the public, circuit-switched telephone network (which keeps a
19 phone line open during a voice call) and sends data traffic to a
packet-switched data network (which compresses data and can send
20 it in splitsecond bursts during gaps on a line), where it can then be
routed to a corporate local area network or Internet service provider
21 ('ISP').")]

22 Brand X Internet Servs. v. F.C.C., 345 F.3d 1120, 1123–25 (9th Cir. 2003), rev'd and remanded

23 on other grounds sub nom. Nat'l Cable & Telecommc'ns Ass'n, 545 U.S. 967; see also U.S. v.

24 Napier, 787 F.3d 333, 346–47 (6th Cir. 2015) (in criminal case, finding emails transmitted over

25 the Internet "were transmitted through interstate wires"); In re DoubleClick Inc. Privacy Litig.,

26 154 F. Supp. 2d 497, 508 (S.D.N.Y. 2001) (regarding Electronic Communications Privacy Act

27 claim, "Access to the Internet is the service an ISP provides.  Therefore, the service which

28 provides to users . . . the ability to send or receive wire or electronic communications is Internet

access.") (internal quotations and emphasis removed); Sarah Kliff, The Internet is, in fact, a series of tubes, The Washington Post (Sept. 20, 2011), https://www.washingtonpost.com/blogs/wonkblog/post/the-internet-is-in-fact-a-series-of-tubes/2011/09/20/gIQALZwfiK_blog.html (last visited Feb. 1, 2022) (Discussing physical structure of the Internet used to transmit information; noting approximately ten percent of Internet traffic is transmitted through satellites and ninety percent is transmitted through a network of submarine cables).

Based on the foregoing authority alone, it appears to this Court that § 605 may apply to a programming signal received through an Internet service that utilizes a satellite-based wireless network. However, the Court must also consider the legislative history, regulatory framework, and statutory interpretation of the Communications Act for support of this conclusion.

ii.   Legislative History, Regulatory Framework, and Statutory Interpretation

As noted, the parties proffer opposing legislative intent arguments in support of their positions. In short, Defendant argues the Internet is not contemplated by § 605 because the statute does not expressly *include* communication transmissions via Internet; conversely, Plaintiff argues the Internet is encompassed by § 605 because it does not expressly *exclude* the technology.

At the hearing on the motion, the Court asked the parties to provide support for their opposing legislative intent arguments, particularly with respect to the effect of the 1984 amendment and the newly added list of exceptions to liability under § 605(b). In response, the parties largely reiterated the arguments from their briefs: Defendant argued that because § 605 was drafted in 1934, at a time when Internet technology did not exist, the legislature could not have contemplated or intended to include Internet streaming in the covered communications under § 605(a). To that point, Defendant argued the legislature has had the opportunity to amend § 605(a) to include a reference to the Internet but declined to do so with the 1984 amendment (or thereafter); therefore, the legislature did not intend to include Internet streaming in the covered communications under § 605(a). Plaintiff reasserted its contention that Defendant's legislative intent argument is speculative and incorrect. Instead, Plaintiff argued Congress anticipated advanced technologies like the Internet and indicated its intent for the § 605 to be inclusive of

developing technologies through the 1984 amendment and legislative history.  In support of its

contention, Plaintiff referenced portions of various legislative history documents:

> In amending existing section 605, it is intended to leave undisturbed the case law that has developed confirming the broad reach of section 605 as a deterrent against piracy of protected communications . . . .
>
> Section 605 not only prohibits unauthorized interception of traditional radio communications, but also communications transmitted by means of new technologies.
>
> [quoting 130 Cong. Rec. S14281, 14287 (daily ed. Oct. 11, 1984).]
>
> . . .
>
> As we enter an age in which direct broadcast satellite (DBS) service to the home will join the many other developing means of transmitting video information to the public, the need to protect against this form of unauthorized reception becomes even clearer . . .
>
> [quoting 127 Cong. Rec. E4879 (daily ed. Oct. 21, 1981)(statement by Rep. Wirth).]

(ECF No. 15 at 11.)

The Court finds Plaintiff generally has the better argument, as demonstrated in the

following review of the evolution of § 605.

1)    Original Communications Act of 1934

As previously noted, § 605 was enacted by Congress by way of the Communications Act

of 1934.  The Communications Act was created to regulate all "interstate and foreign commerce

in communication by wire and radio"; to create "a rapid, efficient, Nation-wide, and world-wide

wire and radio communication service" that was accessible and affordable to the public and that

facilitated public safety and national defense; and to create a "Federal Communications

Commission," a centralized body of authority with consolidated jurisdiction for regulating all

radio and wire communications.  47 U.S.C. § 151; see also Norris, 88 F.3d at 465; TKR Cable

Co., 267 F.3d at 200; Nat'l Cable & Telecommc'ns Ass'n, 545 U.S. 967 (reversing Ninth Circuit

ruling that failed to accord appropriate deference (under Chevron framework) to an FCC ruling,

noting that Congress delegated to the FCC authority to "execute and enforce," the

Communications Act and to "prescribe such rules and regulations as may be necessary in the

1    public interest to carry out the provisions" of the Act).

2          The original § 605 "contained four clauses prohibiting: (1) the unauthorized divulging or

3    publishing of wire or radio communications by the operators responsible for receiving such

4    communications; (2) the unauthorized interception and divulging of wire or radio

5    communications; (3) the unauthorized receipt and use of wire or radio communications for the

6    benefit of the unauthorized receiver or someone else not entitled to the communication; and (4)

7    the divulging, publication, or use of unlawfully intercepted information by anyone knowing that

8    the information was wrongfully obtained." Norris, 88 F.3d at 465 (citing Communications Act of

9    1934, ch. 652, Title VII, § 705, 48 Stat. at 1103); TKR Cable Co., 267 F.3d at 200.  These clauses

10   are now the first four sentences of the modern § 605(a).  See id.; see also Cal. Satellite Sys., 767

11   F.2d at 1366 n.3 (noting second and fourth sentences of § 605(a) were "formerly the second and

12   fourth clauses" of the statute).

13          2)     Omnibus Crime Control and Safe Streets Act of 1968

14          The adoption of the Omnibus Crime Control and Safe Streets Act of 1968, also referred to

15   as the "Wiretap Act" (codified at 18 U.S.C. §§ 2510 et seq.) amended § 605.  The Wiretap Act

16   removed all references to wire (cable) transmissions in § 605, except for the first clause, to which

17   it added the beginning phrase "Except as authorized by chapter 119, Title 18 . . . ."[16]  See Norris,

18   88 F.3d at 465.   The legislative history of the 1968 Act explains that, with respect to wire

19   communications, the amended § 605 was "designed to regulate the conduct of communications

20   personnel," while "[t]he regulation of the interception of wire or oral communications in the

21   future is to be governed by proposed new chapter 119 of title 18, United States Code." Norris, 88

22   F.3d at 465 (citing S. Rep. 90-1097, reprinted in 1968 U.S.C.C.A.N. 2196–97).  Congress further

23   explained the Wiretap Act was "not intended merely to be a reenactment of section 605.  The new

24   provision is intended as a substitute."  S. Rep. 90-1097, reprinted in 1968 U.S.C.C.A.N. 2112,

25   2196–97.  Thus, the Act removed from § 605 the principal share of its authority over wire

26   communications.  TKR Cable Co., 267 F.3d at 201.

27   _____

28   [16] Chapter 119 governs the procedure by which law enforcement personnel may secure a warrant for electronic surveillance.

26

The 1968 amendment, however, created a gap in the regulatory scheme because the definition of "wire communication" for purposes of the Wiretap Act is narrower than the definition in § 605; the Wiretap Act purports to govern wire communications as they relate to common carriers, whereas cable television providers are not common carriers.  See Norris, 88 F.3d at 465–66; United States v. Southwestern Cable Co., 392 U.S. 157, 169 n.29 (1968).  Therefore, courts in the early 1980s, in the absence of any explicit and tailored regulatory framework, were still required to use § 605 as a means of preventing the theft of cable services.  See Charter Commc'ns Ent. I, DST v. Burdulis (Burdulis), 460 F.3d 168, 174–75 (1st Cir. 2006).

### 3)   Cable Communications Act of 1984

With the cable industry expansion, however, Congress decided that the need to deter piracy of cable television transmissions "had become significantly pressing to merit legislation." TKR Cable Co., 267 F.3d at 206.  In 1984, noting its "extreme[] concern[] with a problem which is increasingly plaguing the cable industry — the theft of cable service," Congress amended and supplemented the Communications Act with the Cable Communications Policy Act.  See Webb, 545 F.3d at 843 quoting H.R. REP. 98-934, 83, reprinted in 1984 U.S.C.C.A.N. 4655, 4720).  The 1984 Act enacted § 553 and provided a new regulatory framework that courts could use to combat the theft of cable services, particularly "the manufacture and sale of equipment intended to permit reception of cable services without paying for it [and] apartment building dwellers 'tapping' into cable system wire . . . to obtain cable service [and] . . . access to premium movie and sports channels without paying for the receipt of those services."  See H.R. REP. 98-934, 83, reprinted in 1984 U.S.C.C.A.N. 4655, 4720.

The legislative history for the 1984 Act distinguishes § 553's coverage of cable services-related theft from § 605's coverage of radio-based communications, while noting the intent that § 605 continue to have a "broad reach" in providing "broad protection against the unauthorized interception of various forms of radio communications":

> The Committee intends the phrase "service offered over a cable system" to limit the applicability of [§ 553] to theft of a service from the point at which it is actually being distributed over a cable system.  Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another

technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.

. . .

Hence, [§ 553(a)(2)] is primarily aimed at preventing the manufacture and distribution of so-called "black boxes" and other unauthorized converters which permit reception of cable service without paying for the service.

H.R. REP. 98-934, 83–84, reprinted in 1984 U.S.C.C.A.N. 4655, 4720–21; see also Sykes, 75 F.3d at 132–33 (quoting 130 Cong. Rec. S14285 (daily ed. Oct. 11, 1984) (statement of Sen. Packwood), reprinted in 1984 U.S.C.C.A.N. 4738 (statement of Senator Robert W. Packwood, chairman of the Senate Committee on Commerce, Science, and Transportation adopting the 1984 legislative history with "modifications" emphasizing broad reach of amended § 605)).   The majority of circuit courts have reached conclusions consistent with this legislative history, holding that § 605 does not encompass the receipt or interception of communications from a cable system.  See, e.g., Burdulis, 460 F.3d at 172–74 (1st Cir.); TKR Cable Co., 267 F.3d at 200–07 (3rd Cir.); J&J Sports Prods., Inc. v. Mandell Fam. Ventures, L.L.C., 751 F.3d 346, 351–52 (5th Cir. 2014) (5th Cir.); Cablevision of Michigan, Inc., 27 F.3d 566, at *3 (6th Cir. 1994) (6th Cir.); Norris, 88 F.3d at 469 (7th Cir.).  Courts have also concluded §§ 605 and 553 were intended to cover distinct types of transmissions based on the statutory language creating distinct definitions of "radio" and "wire."  See 47 U.S.C. § 153; see also, e.g., Norris, 88 F.3d at 469 ("the text of the Communications Act reinforces the definitional distinction between radio and wire communications through its repeated disjunctive references to "radio or wire" communications); TKR Cable Co., 267 F.3d at 200; Burdulis, 460 F.3d at 172.

Finally, the 1984 Act amended § 605 by adding subsections (b)–(e) "to curb 'the growing practice of individuals taking down satellite delivered programming for private, home viewing by means of privately owned backyard earth stations' " and retaining the existing § 605 without alteration as § 605(a).  See Webb, 545 F.3d at 843; Sykes, 75 F.3d at 128; see also Nat'l Satellite Sports, Inc., 253 F.3d at 911 ("In § 605(a), Congress retained "the types of unauthorized publication or use of electronic communications that ha[d] been prohibited since the

1    Communications Act first became law.").

2           4)      Satellite Home Viewer Act of 1988

3           In 1988, Congress again amended the Communications Act in order "to deter piracy

4    practices." See The Satellite Home Viewer Act of 1988, Pub. L. No. 100–667, § 205, 102 Stat.

5    3959–60.  "These amendments stiffened applicable civil and criminal penalties, expanded civil

6    standing to sue, and added the provision now identified as § 605(e)(4), which prohibits the

7    manufacture, sale, modification, and distribution of pirate access devices." Webb, 545 F.3d at

8    843 (citing H.R. Rep. No. 100–887(II) (1998), at 28, reprinted in 1988 U.S.C.C.A.N. 5638,

9    5657).

10          In sum, a review of the statutory history of § 605 reveals the statute, when first enacted,

11   was meant to be construed expansively to cover all communications known and anticipated

12   through technological advances.  Certain amendments and controlling case law may have carved

13   out exceptions to that coverage but on whole, the legislative history reflects Congress' intent that

14   § 605 be construed expansively.  See, e.g., H.R. REP. 98-934, 83, reprinted in 1984 U.S.C.C.A.N.

15   4655, 4746 ("[S]ection 605[has] provided broad protection against the unauthorized interception

16   of various forms of radio communications.  It is the Committee's intention that the amendment

17   preserve these broad protections.").

18          Accordingly, it appears to this Court that § 605(a) was intended to encompass new

19   technologies, and that liability for intercepting unauthorized radio/satellite programming signals

20   attaches where information is conveyed through these technologies unless an exception expressly

21   identified under § 605(b) applies.  This is not to say that a communication broadcast via Internet

22   streaming always violates § 605, as other elements in addition to broadcasting must be satisfied to

23   establish a § 605 claim.  See, e.g., Cal. Satellite Sys., 767 F.2d at 1366 (requiring interception as

24   well as publication).[17]  Nor does the Court find unauthorized Internet streaming shall always

25   _____

     [17] The Court additionally notes courts vary in their application of the term "intercept" for purposes of determining

26   liability under § 605, as the statute does not provide a specific definition for the term.  Cf. Goldman v. United States,
     316 U.S. 129, 133–34 (1942) (observing that "intercept" under the Communications Act "indicates the taking or

27   seizure by the way or before arrival at the destined place"), overruled on other grounds, Katz v. United States, 389
     U.S. 347 (1967); see also Cablevision of Michigan, Inc., 27 F.3d 566 ("As the statute speaks of transmission, and the

28   legislative history indicates that Congress was concerned with the piracy of satellite signals, 1984 U.S.C.C.A.N. at
     4720, any rebroadcast of cable programming via videotape is not an interception within the meaning of Section

invoke § 605 and not § 553, as Congress has distinguished the statutes by the *method of transmission*, not the technology.   Rather, the Court concludes that a radio/satellite-based transmission intercepted via an Internet system that utilizes radio or satellite to stream the content is covered under § 605(a).

       iii.   <u>Application to Instant Facts</u>

Applying the foregoing findings, the Court evaluates whether Defendant has met her burden to "either produce evidence negating an essential element of [Plaintiff's] claim . . . or show that [Plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  <u>Nissan Fire</u>, 210 F.3d at 1102.  The Court finds Defendant has not submitted sufficient evidence to meet her burden as follows.[18]

As previously noted, § 605(a) prohibits four practices in four discrete sentences.  While all sentences under § 605(a) pertain to communications by wire and/or by radio, the remaining elements required to establish a violation under § 605 differ:

Sentence One prohibits a person from: (1) "receiving, assisting in receiving, transmitting, or assisting in transmitting" (2) an interstate or foreign communication (3) by wire or radio and (4) divulging or publishing it.  47 U.S.C. § 605(a).

Sentence Two prohibits a person from: (1) unauthorized (2) interception of (3) a radio communication and (4) the divulging or publication of the intercepted information (5) "to any person."  <u>Id.</u>

---

605(a).  Given that there was no interception, the mere fact that the bar "divulge[d]" or "publish[ed]" the Holyfield–Douglas fight cannot make it liable under Section 605(a)."); <u>Patel</u>, 364 F. Supp. 3d at 1372 (granting summary judgment as to § 605 claim based on second and fourth clauses, where plaintiff "provided no evidence showing that defendants intercepted a radio communication or . . . knowingly received a radio communication intercepted by someone else.").  Nonetheless, as Defendant does not submit argument or evidence purporting to negate the element of interception, this issue is not properly before the Court with respect to the instant motion for summary judgment and the Court declines to further address it here.

[18] Defendant makes no argument in the alternative that, if found liable under one of the four sentences of § 605(a), one of the exceptions to liability set forth under § 605(b) applies to this action.  At most, the § 605(b) exceptions were briefly addressed at the hearing, at which time it was agreed by all parties that, if only the subscriber of the streaming service (Mr. Oseguera) was watching the Program, the exception under § 605(b) would apply, but otherwise no exception would apply.  Here, however, it appears plain from the parties' briefings that this express exception is not applicable to the instant case because Mr. Oseguera was not the only person watching the Program; rather, it was exhibited at the Restaurant for Defendant, Mr. Oseguera, and Plaintiff's investigator to watch.  The Court therefore addresses only Defendant's argument under § 605(a).

Sentence Three prohibits a person (1) who is not "entitled thereto" from (2) receiving or assisting in receiving (3) any interstate or foreign communication (4) by radio and (5) use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." Id.

Finally, Sentence Four prohibits a person who has (1) received or become acquainted with the contents, substance, purport, effect, or meaning of (2) a radio communication (3) known to be (4) intercepted from (5) divulging or publishing "the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof)" or use it for his own benefit or for the benefit of another not entitled thereto. Id.

In the instant case, the parties do not appear to distinguish between the four prohibited practices under § 605(a) in their briefings, even though the different sentences identify some different elements.[19]  Instead, Plaintiff generally claims Defendant violated § 605.  (Compl. 6–9.) Regardless, Defendant's Internet defense argument may be asserted to challenge Plaintiff's § 605 claim under each of the four sentences as it disputes that the at-issue communication, received and exhibited via the Internet, constitutes a satellite or radio communication in any manner.  As the Court has previously noted, this is the only basis for Defendant's motion for summary judgment and therefore the only defense the Court will consider for purposes of the motion presently before it.

The evidence Defendant submits relevant to the Internet defense is her own declaration and the declaration of Ruben Oseguera.  Both declarations aver, in identical language, that the Internet was used to stream Plaintiff's Program, and "no satellite signal was used."  (Infante Decl.

---

[19] For example, the Court notes the legislative history of the 1968 Act reveals that the first sentence of § 605(a) "is designed to regulate the conduct of communications personnel."  Rep. 90-1097, 78, reprinted in 1968 U.S.C.C.A.N. 2112, 2197.  The Ninth Circuit does not appear to have ruled on this issue.  See California Satellite Sys., 767 F.2d at 1366 n.3 (declining in footnote to "express [any] opinion on the defendant's construction of section 605 in which he contends that only the second and fourth sentences . . . apply to him because he is not a radio communications employee" as unnecessary to the disposition of that case).  However, based on the aforementioned 1968 legislative history, many other circuits have determined a plaintiff cannot recover under the first sentence of § 605 where, as here, there is no evidence the defendants were acting as "communications personnel" or "authorized intermediaries" with respect to the at-issue programming signal.  See Sykes, 75 F.3d at 131 n.4; TKR Cable Co., 267 F.3d at 201; Edwards v. State Farm Ins. Co., 833 F.2d 535, 540 (5th Cir. 1987); Nat'l Satellite Sports, Inc., 253 F.3d at 916; Norris, 88 F.3d at 465.  Nonetheless, as Defendant has not raised this issue in her motion for summary judgment, the Court declines to consider it here.

1   ¶ 3; Oseguera Decl. ¶ 3.)  Plaintiff objects to the second statement, as asserted in Defendant's

2   statement of facts and supporting evidence, on the basis that Defendant fails to explain how the

3   Internet signal reached the DAZN application.  (ECF No. 15-1 at 4.)  Plaintiff's objection is

4   sustained for lack of foundation as to the basis for this asserted fact.

5          The statement in Defendant's declarations is a conclusion without any facts to support the

6   conclusion.  Defendant offers no evidence to demonstrate how the Internet was accessed at the

7   Restaurant (e.g., via wireless laptop, cell phone 5g service, what kind of hardware, if any was

8   utilized at the Restaurant to receive the Internet signal, etc.), Defendant does not identify the

9   Internet service provider utilized at the Restaurant to download and stream the Program, and no

10  expert evidence was provided with respect to that Internet service to establish that neither satellite

11  nor cable was utilized to transmit/receive the Program signal.[20]  See also Innovative Sports

12  Mgmt., Inc. v. Castillo, No. 19-CV-01596-REB-NYW, 2020 WL 12584442, at *6 (D. Colo. Apr.

13  30, 2020), report and recommendation adopted, No. 19-CV-01596-REB-NYW, 2020 WL

14  12584445 (D. Colo. Jul. 27, 2020) (denying motion for default judgment on basis that, even if §

15  605 applies to internet streaming transmitted via radio, the record did not establish that the

16  defendants used radio to access the internet).  Accordingly, Plaintiff's objection is sustained.

17         Based on this record, the Court cannot discern the specific method of internet usage in this

18  case.  Therefore, Defendant fails to carry her burden to establish she did not utilize a radio or

19  satellite system by using the Internet to receive the at-issue Program signal.[21]  Celotex, 477 U.S.

20  at 323; Nissan Fire, 210 F.3d at 1102.  Further, Defendant does not argue that any other element

21  of Plaintiff's § 605(a) claim has been negated by the undisputed facts and evidence.  Nissan Fire,

22  ─────────────

23  [20] Defendant has not established sufficient personal knowledge or expertise in internet technology or her internet service provider by herself or Mr. Oseguera to provide testimony as to the technology platform utilized by her

24  internet service provider, the platform utilized to receive the programming signal from DAZN via the Internet, or to identify the type of signal she received via the Internet.

25  [21] The Court is cognizant of a circuit split over whether an unauthorized communication must be received directly by a radio/satellite-based system to establish liability or if the unauthorized communication need only have originated as

26  a radio/satellite transmission, and is unaware of any Ninth Circuit authority definitively ruling on this issue. Compare TKR Cable Co., 267 F.3d at 207 with Sykes, 75 F.3d at 131 n.5.  Regardless, Plaintiff submits evidence

27  that the Program was originally transmitted as a satellite signal and Defendant does not contest or submit evidence to refute this claim, but only challenges the satellite communication element based on her receipt of the signal via the

28  Internet.  Therefore, under either interpretation of § 605, Defendant's motion must be denied because she has not met her burden of production on summary judgment.

1  210 F.3d at 1102.  Therefore, summary judgment based on the Internet defense is not warranted.

2  Id. at 1102–03; Adickes, 398 U.S. at 160.

3  **B.   "Exhibition" of the Program**

4  Defendant alternatively asserts summary judgment is appropriate because there were

5  "literally zero people present at [the Restaurant] viewing the exhibition of the subject TV

6  program."  (ECF No.  14 at 6.)  In short, Defendant suggests that because no one was present

7  (other than Defendant, Mr. Oseguera, and Plaintiff's investigator) to view the Program, there was

8  no "exhibition" or "publication" of the Program within the meaning of § 605 and therefore §

9  605(a) is inapplicable here.  (Id.)  Notably, Defendant cites no legal authority for this proposition.

10  In opposition, Plaintiff correctly notes Defendant provides scant legal argument and zero

11  legal authority to support her contention.  For this reason alone, the Court finds Defendant fails to

12  carry her burden on summary judgment.  See Nissan Fire, 210 F.3d at 1102–03; Adickes, 398

13  U.S. at 160.  At the hearing, Plaintiff additionally pointed out that the lack of customers was "not

14  for a lack of trying," as Defendant advertised the event on the Restaurant's Facebook page.

15  Further, Plaintiff argued that patronage is not a threshold part of the factors for determining

16  liability.  The Court agrees with Plaintiff on this point as well; the issue of how many patrons at

17  the Restaurant — if any — actually viewed the Program when it was broadcast at the Restaurant

18  pertains to the issue of damages, not liability.  Accordingly, Defendant's motion for summary

19  judgment based on this alternative argument should also be denied.

20  **C.   Partial Summary Judgment as to Enhanced Statutory Damages**

21  Alternatively, Defendant also moves for partial summary judgment as to Plaintiff's claims

22  for enhanced statutory damages under §§ 605 and 553.  (ECF No. 14 at 7–9.)  Defendant argues

23  there is no evidence that she committed a "willful" violation of § 605 for the purpose of

24  commercial advantage or private financial gain.  To the contrary, Defendant has averred that she

25  did not realize there was anything illegal, wrong, or in any way improper for the Restaurant to

26  receive an Internet signal for the Program through DAZN.  Further, Defendant argues caselaw

27  indicates enhanced damages are only appropriate in cases in which there may have been an

28  unknowing violation where there are aggravating circumstances, such as repeated violations and

1   significant actual damages suffered by Plaintiff.

2   In opposition, Plaintiff argues a material disputed fact exists as to whether enhanced

3   damages are warranted because Defendant advertised the Program on the Restaurant's Facebook

4   page.  Plaintiff also argues a material dispute exists as to whether Defendant had knowledge that

5   she was not permitted to broadcast the Program in her Restaurant based on the terms of the

6   DAZN user agreement, which provides that any content viewed through the DAZN service must

7   be for personal and non-commercial use only.

8   As an initial matter, the Court notes that, in light of its determination that dismissal of

9   Plaintiff's § 553 claim is appropriate, it follows that denial of Plaintiff's request for enhanced

10   statutory damages pursuant to § 553 is also appropriate.   Therefore, to that extent only,

11   Defendant's motion for partial summary judgment should be granted.

12   With respect to the remainder of Defendant's motion, however, the Court finds Plaintiff

13   has the better argument.  Plaintiff does not bring a separate claim for enhanced statutory damages,

14   but merely includes the request for enhanced damages in its cause of action for violations of §

15   605 and in its prayer for relief.  As the Court is recommending denial of summary judgment as to

16   Plaintiff's § 605 claim, it declines to address the issue of damages as prematurely raised in

17   Defendant's motion for summary judgment.  Rather, the issue of the amount of damages should

18   be addressed either at trial after a finding of liability or within the context of a default judgment

19   motion.  Indeed, the majority of cases cited by Defendant in support of her motion for partial

20   summary judgment pertain to rulings on the issue of damages as raised by the plaintiff in a

21   motion for default judgment and therefore support this finding.  See, e.g., Joe Hand Promotions,

22   Inc. v. Kaczmar, No. 08 C 2910, 2008 WL 4776365 (N.D. Ill. Oct. 29, 2008); Integrated Sports

23   Media, Inc. v. El Guadalajara, Inc., No. CV 10-2017 (DRH) (AKT), 2011 WL 4434165

24   (E.D.N.Y. Aug. 30, 2011); J & J Sports Prods., Inc. vs. Hot Shots, No. CV-09-1884 (FB), 2010

25   WL 3522809; J & J Sports Productions, Inc. vs. Welch, No. 10-CV-0159 (KAM), 2010 WL

26   4683744.  Nor do the remainder of Defendant's cases support her contention, as the plaintiff in

27   those cases filed a cross-motion for summary judgment, which was granted by the court, thus

28   establishing liability on the claims for which the plaintiff sought damages.  See Joe Hand

1    Promotions, Inc. v. Santana, 964 F. Supp. 2d 1067, 1070 (N.D. Cal. 2013); Albright, 2013 WL

2    2449500, at *6.

3        Furthermore, even considering Defendant's argument regarding enhanced statutory

4    damages under § 605, the Court finds partial summary judgment in not warranted here because a

5    disputed issue of fact exists as to whether Defendant's actions were "willful" under the meaning

6    of the statute, and it is disputed what amount of damages arises from the broadcast based on the

7    number of customers present.  Accordingly, Defendant's motion for partial summary judgment

8    with respect to enhanced damages on Plaintiff's § 605 claim should be denied.

9        **D.    Defendant's Remaining Arguments on Summary Judgment and Damages**

10       Alternatively, Defendant argues that "one way or another" summary judgment should be

11   granted for one of the parties because there is no material dispute of the facts.  To that point, and

12   in the event that the Court would enter summary judgment for Plaintiff, Defendant submits

13   argument on the issue of damages.  (ECF No. 14 at 9–13.)  Defendant's arguments are unavailing.

14       As Plaintiff correctly notes, Plaintiff has not filed a cross-motion for summary judgment;

15   rather, the only motion presently before the Court is Defendant's motion for summary

16   judgment/motion for partial summary judgment.  Indeed, at the hearing on the motion, Plaintiff

17   confirmed it does not seek summary judgment at this time but instead wishes to appear and give

18   testimony at trial.  As such, the denial of summary judgment in Defendant's favor as to one issue

19   does not result in automatically granting judgment in Plaintiff's favor as to that issue.  Indeed, the

20   entry of judgment in Plaintiff's favor on any issue at this time would be improper as Plaintiff has

21   not requested summary judgment.

22       In light of this finding, the Court declines to address Defendant's argument on the issue of

23   damages, as there has been no finding of liability and such argument is premature.  Defendant's

24   motion for summary judgment should therefore be denied as to these remaining points.

25                                    **IV.**

26                         **CONCLUSION AND RECOMMENDATION**

27       Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendant's motion for

28   summary judgment (ECF No. 14) be GRANTED IN PART and DENIED IN PART as follows:

                                        35

1.      Defendant's motion for summary judgment be GRANTED as to Plaintiff's claim for violations of 47 U.S.C. § 553 (Count II);

2.      Defendant's motion for partial summary judgment be GRANTED as to Plaintiff's claim/prayer for enhanced statutory damages in relation to its claim under 47 U.S.C. § 553; and

3.      Defendant's motion be DENIED in all other regards.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 9, 2022**

_____
UNITED STATES MAGISTRATE JUDGE